IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NOEMI MONTANO LIM,

        Plaintiff,                         No. 2:10-CV-00958-KJN (TEMP)

    v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.              ORDER
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").[1]  In her motion for summary judgment, plaintiff principally contends that the Administrative Law Judge ("ALJ") erred by finding that plaintiff's disability ceased as of June 30, 2007.  (Dkt. No. 11.)  The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary judgment.  (Dkt. No. 17.)  Plaintiff filed a reply brief.  (Dkt. No. 18.)  For the reasons that follow, the court grants plaintiff's motion for summary judgment in part, denies the Commissioner's cross-motion for summary

---

[1] This case was referred to the undersigned pursuant to Eastern District of California Local Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States Magistrate Judge.  (Dkt. Nos. 6, 12.)

1

judgment, and remands the case for further proceedings under sentence four of 42 U.S.C. § 405(g).

## I.  BACKGROUND

Plaintiff was born on September 10, 1958, has an associates degree, and previously worked as a safety coordinator for a large manufacturer.[2]  (Administrative Transcript ("AT") 192.)  On April 8, 2003, plaintiff applied for DIB, alleging that she was unable to work as of September 1, 2002, due to fibromyalgia, degenerative changes of the cervical, thoracic, and lumbar spine, bilateral plantar fasciitis, irritable bowel syndrome, and depression.  (AT 33.)  Plaintiff was found disabled by an ALJ on December 13, 2004; however, on June 27, 2007, the Commissioner determined that plaintiff was no longer disabled as of June 28, 2007.  (AT 28, 37.)  Plaintiff filed a request for reconsideration which was denied, and subsequently requested and received a hearing before a disability hearing officer on December 18, 2007.  (AT 27, 38, 41-52.)  After an unfavorable decision, plaintiff requested a hearing before an ALJ, which took place on May 26, 2009.  (AT 53-65, 68, 69-75, 188-217.)

In a decision dated October 15, 2009, ALJ Daniel G. Heely determined that plaintiff's disability ended as of June 30, 2007.  (AT 18-25.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  (AT 5-7, 13-14.)  Plaintiff subsequently filed this action.  (Dkt. No. 1.)

## II.  ISSUES PRESENTED

Plaintiff has raised the following issues: (1) whether the Commissioner improperly failed to credit the examining psychiatrist's opinion as to the extent of plaintiff's limitations; (2) whether the Commissioner improperly omitted from plaintiff's residual functional capacity assessment the restriction that she requires ready access to restroom facilities;

---

[2]  Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the court does not exhaustively relate those facts here.  The facts related to plaintiff's impairments and medical history will be addressed only insofar as they are relevant to the issues presented by the parties' respective motions.

and (3) whether the Commissioner incorrectly required a showing of pain, as opposed to tenderness, in support of plaintiff's fibromyalgia diagnosis.[3]  (Pl.'s Mot. 1-2.)  Finally, although plaintiff does not raise credibility as a separate issue, plaintiff generally contends that the ALJ wrongly rejected her subjective testimony based on his improper analysis of the medical evidence.  (Pl's Mot. 1 n.1.)

III.    LEGAL STANDARDS

Where the issue of continued disability or medical improvement is concerned, "a presumption of continuing disability arises" in the claimant's favor once that claimant has been found to be disabled.  Bellamy v. Sec'y of Health & Human Servs., 755 F.2d 1380, 1381 (9th Cir. 1985) (citing Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983)).  The Commissioner has the "burden of producing evidence sufficient to rebut [the] presumption of continuing disability."  Id.; see also Murray, 722 F.2d at 500 ("The Secretary . . . has the burden to come forward with evidence of improvement.").  However, a reviewing court will not set aside a decision to terminate benefits unless the determination is based on legal error or is not supported by substantial evidence in the record as a whole.[4]  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984); accord Bellamy, 755 F.2d at 1381; Murray, 722 F.2d at 500.

Relevant here, a claimant's benefits may be terminated where the Commissioner

---

[3] In the statement of her third issue, plaintiff also alleges that the ALJ erred in failing to make any findings of fact as to the frequency and severity of her bowel and urinary incontinence. However, this appears to logically relate to the second issue regarding ready access to restroom facilities.

[4] "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); accord Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's."  Bray, 554 F.3d at 1222 (citing Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007)); see also Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld.") (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

produces substantial evidence that: "(A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1). The applicable regulation defines "medical improvement" as follows:

> Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s). . . .

20 C.F.R. § 404.1594(b)(1).

The Commissioner evaluates whether a claimant continues to be entitled to DIB under an eight-part analytical framework, which consists of the following steps:

> (1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).
>
> (2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.
>
> (3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)
>
> (4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).
>
> (5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will

4

> be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.
>
> (6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.
>
> (7) If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.
>
> (8) If you are not able to do work you have done in the past, we will consider one final step. Given the residual functional capacity assessment and considering your age, education and past work experience, can you do other work? If you can, disability will be found to have ended. If you cannot, disability will be found to continue.

20 C.F.R. § 404.1594(f)(1)-(8). The Commissioner's regulations further provide that for the purposes of determining whether medical improvement has occurred, the Commissioner "will compare the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled . . . to the medical severity of that impairment(s) at that time." 20 C.F.R. § 404.1594(b)(7).

IV.   DISCUSSION

    A.   Summary of the ALJ's Findings

The ALJ noted that at the time of the most recent favorable medical decision (the previous ALJ's disability finding on December 13, 2004), plaintiff suffered from the following severe medically determinable impairments: fibromyalgia; degenerative changes of the cervical,

5

thoracic, and lumbar spine; bilateral plantar fascitis; and irritable bowel syndrome.  (AT 19-20.)  These impairments were found to result in the residual functional capacity to lift less than 10 pounds occasionally, stand and walk for a total of 2 hours in an 8 hour work day, sit for a total of 4 hours in an 8 hour work day, and only occasionally use her hands for reaching and handling.  (AT 20.)

The ALJ then proceeded to evaluate plaintiff's continued entitlement to DIB pursuant to the eight-step analytical framework.  At the first step, the ALJ concluded that plaintiff had not engaged in substantial gainful activity as of June 30, 2007, the date that claimant's disability presumably had ended.  (AT 20.)  At step two, he found that plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AT 20.)  At step three, the ALJ determined that plaintiff had experienced medical improvement as of June 30, 2007, primarily because her fibromyalgia symptoms have stabilized and improved, her treating rheumatologist only noting tenderness as opposed to pain in the relevant trigger points; and her plantar fascitis has improved such that her treating podiatrist no longer considered her to have a disabling impairment from a podiatric standpoint alone.  (AT 20-21.)

Because the ALJ found medical improvement, he proceeded to step four of the analysis.  At step four, he concluded that plaintiff's medical improvement was related to her ability to work because it resulted in an increase in plaintiff's residual functional capacity.  (AT 20, 21-22, 24.)  The ALJ stated that plaintiff had the RFC "to lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk in combination for 2 hours out of an 8 hour day; and sit for up to 6 hours out of an 8 hour day, provided she is allowed to stand and stretch at her workstation for a brief period once an hour.  She can never crawl and can only occasionally stoop, crouch, or kneel.  Additionally, [she] can maintain sufficient concentration to perform simple routine tasks in a job requiring only occasional public contact."  (AT 21-22.)

Because the ALJ determined that plaintiff's medical improvement related to her

1  ability to work, he proceeded to step six of the analysis. See 20 C.F.R. § 404.1567(f)(4). At step
2  six, the ALJ concluded that plaintiff's impairments were "severe" within the meaning of the
3  regulations because they caused more than minimal limitation in plaintiff's ability to perform
4  basic work activities. (AT 24.) Accordingly, the ALJ proceeded to step seven, where he
5  determined that plaintiff was unable to perform past work, i.e., work as a safety coordinator. (AT
6  24.)
7         Finally, at the eighth step, the ALJ concluded that as of June 30, 2007, plaintiff
8  was no longer disabled, because she "was able to perform a significant number of jobs in the
9  national economy." (AT 24.) He made this determination in consideration of plaintiff's age,
10 education, work experience, and RFC. (AT 24.) The ALJ relied on the testimony of a vocational
11 expert ("VE"), who testified that an individual with plaintiff's RFC could perform work as: (1) a
12 "ticket counter," a sedentary level job with 3,200 positions available in California; (2) an
13 "addresser," another sedentary level job with 11,900 positions available in California; and (3) a
14 "lens inserter," with 4,000 positions available in California. (AT 25.)

    B.    Plaintiff's Substantive Challenges to the ALJ's Decisions

        1.    Whether the Commissioner Improperly Failed to Credit the Examining Psychiatrist's Opinion as to the Extent of Plaintiff's Limitations

18        Plaintiff asserts that although the ALJ indicated that he was crediting the opinion
19 of plaintiff's examining psychologist, Dr. Les P. Kalman,[5] he failed to articulate why he did not
20 adopt Dr. Kalman's opinion as to the extent of plaintiff's limitations.
21        The medical opinions of three types of medical sources are recognized in social
22 security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but
23 do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the
24 claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

---

[5] Dr. Kalman was retained by plaintiff to conduct a psychiatric evaluation. (AT 21, 158-68.)

7

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  Id.  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the physician's ultimate conclusions.  Id.  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.  Id. at 830-31; accord Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009).  "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings.'"  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony."  Magallanes, 881 F.2d at 750; see also Burkhart v. Bowen, 856 F.2d 1335, 1339-40 (9th Cir. 1988) (affirming where the ALJ carefully detailed arguably conflicting clinical evidence and provided reasons for crediting one treating physician's opinion over another treating physician's opinion).

In this case, plaintiff did not have a treating psychiatrist or psychologist.  Her primary care physician, Dr. Abina Benabye, had not referred plaintiff to a mental health professional and did not detect signs of a mental impairment.  (AT 21, 137.)  On September 26, 2007, a State Agency psychiatric consultant, Dr. Lon Gottschalk, reviewed plaintiff's prior records and completed a Psychiatric Review Technique Form.  (AT 21, 138-51.)  He diagnosed plaintiff with an adjustment disorder and depressed mood secondary to her physical impairments, but noted that she was in "good partial remission" due to her psychiatric medication.  (AT 138, 150.)  He concluded that her adjustment disorder was not severe, and that plaintiff was not having significant psychological issues.  (AT 138, 150.)

Subsequently, on December 26, 2007, Dr. Kalman performed a psychiatric evaluation of plaintiff. (AT 158-68.) He diagnosed her with an adjustment disorder, with mixed anxiety and depression, chronic, secondary to fibromyalgia, and rated her as having a GAF of 52.[6] (AT 162.) Dr. Kalman assessed plaintiff as "moderately limited" in her ability to understand, remember, and carry out detailed (3 or more steps) instructions or tasks. (AT 166.) "Moderately limited" was defined as follows:

> Performance of the designated work-related mental function is not totally precluded, but it is substantially impaired in terms of speed and accuracy and can be performed only seldom to occasionally during an 8-hour workday, for example, for short durations lasting from 5 to 15 minutes not totaling more than 2 to 3 hours in an 8-hour workday.

(AT 165.) He also assessed plaintiff as "mildly limited" in several mental functions, including the ability to: (1) maintain attention and concentration for extended periods, (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure) with four such periods in a workday; and (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AT 166.) "Mildly limited" was defined as follows:

> Performance of the designated work-related mental function is somewhat impaired. For example, the individual can perform this work-related function at a level equal to or greater than 80 to 85% of normal in terms of speed and accuracy, but the individual can perform the function only occasionally to frequently, (from 1/3 to 2/3 of an 8-hour workday) but not constantly or continuously.

(AT. 165.) Dr. Kalman found plaintiff to be not significantly limited in several functions,

---

[6] GAF is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM IV"). According to the DSM IV, a GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id.

including the ability to understand, remember, and carry out short and simple (one- or two-step) instructions or tasks.  (AT 165-66.)

Additionally, Dr. Kalman indicated that certain work-related stressors would increase the level of impairment assessed, including "[u]nruly, demanding or disagreeable customers even on an infrequent basis"; "[p]roduction demands or quotas"; [a] demand for precision (intolerance of error rates in excess of 5% to 10%)"; and "[a] need to make quick and accurate independent decisions in problem solving on a consistent basis."  (AT 167.)  Finally, Dr. Kalman noted that plaintiff's impairment is sufficiently severe that for more than three or four times per month she would be unable to complete the workday if employed in a full-time job.  (AT 168.)

In his decision, the ALJ reviewed Dr. Kalman's and State Agency consultant Dr. Gottschalk's findings, stating:

> [B]oth Doctor Les Kalman, M.D. whom the claimant hired to conduct a one-time psychiatric evaluation in December of 2007 and Dr. Lon Gottschalk, M.D., a State agency psychiatric consultant who completed a Psychiatric Review Technique Form for the claimant after reviewing her medical records on September 26, 2007, diagnosed her with adjustment disorder secondary to physical impairments.  Dr. Kalman opined that the claimant was moderately limited only in her ability to understand, remember, and carry out detailed instructions...Dr. Gottschalk opined that the claimant's adjustment disorder is in good partial remission due to her psychiatric medication and opined that it causes no significant limitations to her ability to perform mental work activity...The undersigned gives significant weight to these opinions as they are consistent with the record as a whole and supported by objective findings.

(AT 21.)

Although the ALJ supposedly credited Dr. Kalman's opinion, he did not incorporate several of Dr. Kalman's specific limitations into plaintiff's RFC.  First, because Dr. Kalman found that plaintiff's ability to maintain attention and concentration for extended periods was "mildly impaired," this meant that plaintiff could only concentrate for extended periods

////

(approximately 2 hours) for up to 2/3 of the workday.[7]  Nevertheless, a limitation of sustained concentration for only 2/3 of the workday was never incorporated into the RFC.  To be sure, the ALJ specifically limited plaintiff to "simple routine tasks in a job requiring only occasional public contact" based on Dr. Kalman's assessment that plaintiff was not significantly limited in understanding, remembering, and carrying out short and simple tasks.  (AT 22, 165-66.)  However, Dr. Kalman's assessment distinguishes between her ability to perform simple versus complex tasks and her ability to sustain concentration *regardless of the complexity*, and it is the latter limitation that was never addressed in the ALJ's decision.  Second, the ALJ failed to address Dr. Kalman's specific finding that for more than three or four times per month plaintiff would be unable to complete a workday if employed in a full-time job.

        As discussed above, if the treating or examining doctor's medical opinion is contradicted by another doctor, the ALJ must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.  Lester, 81 F.3d at 830-31.  Furthermore, if the RFC assessment conflicts with a medical source opinion, the ALJ must explain why the opinion was not adopted.  See SSR 96-8p, at *7.  Here, the ALJ not only failed to provide specific and legitimate reasons for failing to adopt several of Dr. Kalman's limitations, but in fact provided no reasons at all.  To the contrary, the decision appears to fully credit his opinion as "consistent with the record as a whole and supported by objective findings."[8]  (AT 21.)

---

[7] This conclusion leads logically from the definition of "mildly impaired" used by Dr. Kalman: "Performance of the designated work-related mental function is somewhat impaired.  For example, the individual can perform this work-related function at a level equal to or greater than 80 to 85% of normal in terms of speed and accuracy, but the individual can perform the function only occasionally to frequently, (*from 1/3 to 2/3 of an 8-hour workday*) but not constantly or continuously."  (AT 165 (emphasis added).)

[8] Defendant points out that the ALJ indicated that he was giving "some weight" to all opinions regarding functional capacity, but "controlling weight to none."  (Def's Mot. 9; AT 23.)  However, this blanket statement provides no specific reasons for rejecting Dr. Kalman's assessment and is insufficient to discredit his opinion.

Defendant contends that Dr. Kalman's definition of several terms such as "mildly limited" defies common sense and is inconsistent with how such terms are used in the social security context. See e.g. 20 C.F.R. § 404.1520a(d)(1) (stating that a "mild" degree of limitation generally suggests that impairment is not severe). This argument is not persuasive because although Dr. Kalman did not employ the conventional definitions of these terms there is no requirement that medical source statements use regulatory definitions. In fact, ALJs have been cautioned not to assume that medical sources using regulatory terms of art are aware of the regulatory definitions of those terms. See SSR 96-5p, at *5.

Defendant also cites authority for the proposition that a limitation to simple, repetitive work adequately captures deficiencies in concentration, persistence, or pace. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). However, in Stubbs-Danielson, unlike the instant case, a medical source specifically indicated that the claimant was not significantly limited in her ability to maintain attention and concentration for extended periods. Id. Also, there was no opinion that the claimant in Stubbs-Danielson would be unable to complete a workday several days each month. Id. at 1173-75.

Finally, defendant points to various portions of the record in an attempt to explain how the ALJ could potentially have discredited Dr. Kalman's opinion. The fact remains that the ALJ did not undertake such an analysis. The Commissioner's decision "must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." See Barbato v. Comm'r of Soc. Sec. Admin., 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996); see also Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) ("[W]e are wary of speculating about the basis of the ALJ's conclusion...."). It may well be that the ALJ did not review the definitions employed by Dr. Kalman and therefore mistakenly thought that his opinion was consistent with that of Dr. Gottschalk. Regardless, the error is not harmless, because whether or not plaintiff can meet the demands of unskilled sedentary work depends on whether she can perform such work on a sustained basis. See SSR 85-15, at *4. This determination would be seriously called into

question if Dr. Kalman's opinion were adopted, i.e. that plaintiff would be absent at least 3-4 times a month and only able to concentrate for 2-hour periods up to 2/3 of the workday.

Because the ALJ failed to articulate specific and legitimate reasons for not adopting Dr. Kalman's opinion as to the extent of plaintiff's limitations, remand is necessary for proper consideration of Dr. Kalman's opinion. Depending on the ALJ's findings, the ALJ may also wish to conduct a supplemental hearing with vocational expert testimony concerning any additional limitations found.

        2.    <u>Whether the Commissioner Improperly Omitted From Plaintiff's RFC the Restriction That She Requires Ready Access to Restroom Facilities</u>

Plaintiff also contends that the ALJ failed to include any limitations regarding her need to have ready access to restroom facilities.

On June 26, 2007, State Agency physician Dr. Janice Thornburg stated in her physical residual functional capacity assessment that plaintiff needed "ready access to bathroom facilities," presumably due to her irritable bowel syndrome and urinary incontinence. (AT 134.) Subsequently, the same physician submitted another physical residual functional capacity assessment on October 3, 2007, which omitted this restriction. (AT 152-57.) In his decision, the ALJ found plaintiff's irritable bowel syndrome to be severe. (AT 20, 24.) He also referred to and credited Dr. Thornburg's June 26, 2007 opinion, which included the restroom restriction, but then failed to incorporate the restriction into his RFC. (AT 21-22, 23.) As stated above, if the RFC assessment conflicts with a medical source opinion, the ALJ must explain why the opinion was not adopted. See SSR 96-8p, at *7.

Defendant argues that the ALJ nonetheless properly evaluated the evidence, because Dr. Thornburg's October 3, 2007 assessment omitted the restroom restriction, and the October assessment represented her most current view. This argument is unpersuasive for two reasons. First, the ALJ never addressed the inconsistency between the two assessments, but in fact referred to and (supposedly) credited the *earlier* June 26, 2007 assessment. (AT 23.)

Second, Dr. Thornburg's subsequent October assessment did not note any improvement in plaintiff's irritable bowel syndrome or urinary incontinence, and reveals no reason why the restriction was omitted from that assessment. (AT 152-57.) It may be that the omission was inadvertent. In any event, the ALJ should, at a minimum, have indicated how he resolved the conflict between the two assessments.

The ALJ's failure to explain his reasoning is not harmless because, as plaintiff points out, not all workplaces will necessarily allow for ready access to restrooms at unscheduled times throughout the day, and the Court cannot independently determine to what extent the inclusion of a "ready access to bathroom facilities" limitation would preclude the occupations listed in the decision. Accordingly, remand is necessary for an additional consultation and findings as to the extent of plaintiff's limitations related to her irritable bowel syndrome and urinary incontinence. Depending on the results of the consultation, the ALJ may also want to conduct a supplemental hearing with vocational expert testimony regarding any such limitations.

      3. <u>Whether the Commissioner Incorrectly Required a Showing of Pain, as Opposed to Tenderness, in Support of Plaintiff's Fibromyalgia Diagnosis</u>

Plaintiff further contends that the ALJ improperly analyzed the medical evidence to conclude that her fibromyalgia had improved. This argument is unpersuasive. The relevant portion of the decision states:

> With regard to the claimant's fibromyalgia, recent medical records indicate that her symptoms have stabilized. She was not seen by a doctor for this complaint for approximately a year prior to first seeing her new rheumatologist, Dr. Dennis Del Paine, M.D., in May of 2008. Dr. Del Paine has noted normal physical examinations including full range of motion in all joints. He also indicated that plaintiff had tenderness, as opposed to pain, in the relevant trigger points during her last four visits. The American College of Rheumatology draws an important distinction between tenderness and pain in their 1990 Criteria for the Classification of Fibromyalgia; tenderness in trigger points is insufficient to support a diagnosis. This is not to say that the claimant no longer has the disease and, as discussed in further detail below, it is clear that the claimant continues to experience pain symptoms. However, it appears from the record as a whole that these symptoms have

14

> significantly improved. Dr. Del Paine also encouraged the claimant to increase her oral dosage of pregabalin and exercise, recommending water aerobics and yoga. In a progress noted [sic] dated October 27, 2008 he recorded his impression that the claimant's fibromyalgia was stable...¶...At the [comparison point decision], the claimant's previous rheumatologist noted pain in the trigger points and stiff, sensitive hands. He opined that the claimant was not capable of significant exertion or of repetitive reaching, handling or fingering...In contrast, Dr. Del Paine did not observe any stiffness or sensitivity in the claimant's hands and he never recommended any exertional restrictions. For these reasons it appears that there has been medical improvement with regard to the claimant's medically determinable impairment of fibromyalgia.

(AT 20-21.)

Plaintiff primarily takes issue with the ALJ's distinction between pain and tenderness in the trigger points. However, the American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia ("Criteria")[9] in fact provide that a tender point must be "painful" at palpation, not just "tender."[10] The ALJ explained that plaintiff's treating physician, Dr. Del Paine, only indicated that plaintiff had tenderness as opposed to pain in the relevant trigger points, and based on the Criteria, the ALJ concluded that her fibromyalgia had improved. (AT 20, 169-81.) The Court finds no error in that conclusion. Plaintiff's reliance on an unpublished decision from the Central District of California, Melendez v. Astrue, 2010 WL 1266838 (C.D. Cal. 2010) is misplaced. In Melendez, the physician "did not state that the palpated points elicited only tenderness, nor did he expressly state that they were painful. Rather, he stated that [the claimant] 'has' 18 out of 18 tender points...." which the ALJ in that case erroneously interpreted to mean tenderness only. Id. at *6. The court in Melendez did not take issue with the pain-tenderness distinction, but rather with the ALJ's interpretation of the medical

---

[9] See *1990 Criteria for the Classification of Fibromyalgia (Excerpt)*, http://www.rheumatology.org/practice/clinical/classification/fibromyalgia/fibro.asp.

[10] The confusion regarding this issue likely results from the fact that, despite the Criteria's distinction between the terms "painful" and "tender," many courts citing to the Criteria tend to use these terms interchangeably. See e.g. Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 ("According to the ACR's 1990 standards, fibromyalgia is diagnosed based on widespread pain with *tenderness* in at least eleven of eighteen sites known as trigger points.") (emphasis added).

15

evidence. By contrast, Dr. Del Paine unambiguously stated that he found "tenderness only." (See e.g. AT 171-72, 175.)

Moreover, the ALJ also based his conclusion of improvement on several other factors, including the fact that Dr. Del Paine did not recommend any exertional restrictions, that plaintiff responded well to her new medication, and that she led a fairly active lifestyle including activities such as cooking, shopping, housekeeping, gardening, as well as some exercise and social activities. (AT 21-23.) Accordingly, the ALJ's finding with respect to improvement of plaintiff's fibromyalgia is supported by substantial evidence in the record as a whole.

Finally, in light of the Court's conclusion that the case should be remanded for further consideration of the medical evidence, additional medical consultation, and potentially a supplemental hearing, the Court will not address plaintiff's general argument that the ALJ erroneously rejected her subjective testimony based on his improper analysis of the medical evidence. On remand, the ALJ will have the opportunity to consider whether revision of his analysis concerning plaintiff's credibility would be appropriate in light of any new evidence or findings.

V.   CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is granted in part and denied in part;

2. The Commissioner's cross-motion for summary judgment is denied;

3. This matter is remanded for further proceedings consistent with this order, pursuant to sentence four of 42 U.S.C. § 405(g); and

4. The Clerk of Court shall enter judgment for plaintiff.

////
////
////

IT IS SO ORDERED.

DATED: August 26, 2011

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Lim.0958.ss.wpd